Filed 7/27/22  P. v. Castaneda CA3
Opinion following transfer from Supreme Court

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C085960 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE006090) |
| v. | OPINION ON TRANSFER |
| JOSEPH ANTHONY CASTANEDA et al., | |
| Defendants and Appellants. | |

Following a jury trial, defendants Ray Anthony Ramirez, Joseph Anthony Castaneda, and Manuel Anthony Labrasca (together, defendants) were each found guilty of two counts of attempted murder (Pen. Code, §§ 187, subd. (a), 664—counts 1 and 2).[1] Castaneda was also found guilty of one count of felony evading a peace officer (Veh. Code, § 2800.2, subd. (a)—count 3).  The jury found true allegations that Ramirez inflicted great bodily injury on one victim (L.R.), and Castaneda and Labrasca inflicted

---

[1] Undesignated statutory references are to the Penal Code.

1

great bodily injury on another (M.G.). The jury also found true allegations that the crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). The trial court sentenced defendants to prison terms ranging from 54 years to life plus 23 years to 23 years and eight months.

Defendants appealed, raising claims of instructional error. Ramirez separately raised claims of sentencing errors. We affirmed the judgments; however, with respect to Ramirez, we vacated two 10-year gang enhancements and remanded for resentencing to allow the trial court to exercise discretion to impose something other than the upper term.

The Supreme Court granted review and transferred the matter back to us with directions to vacate our prior opinion and reconsider the cause in light of Senate Bill No. 775 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 551; Senate Bill 775). The parties filed supplemental briefs addressing the impact of Senate Bill 775. Castaneda and Ramirez also argued for the application of another new law, Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699; Assembly Bill 333).

The parties agree, and we concur, that Senate Bill 775 requires reversal of the attempted murder convictions (counts 1 and 2), because the jury was instructed on attempted murder based on the natural and probable consequences doctrine, and the record does not show beyond a reasonable doubt that the jury did not rely on the doctrine. Castaneda, Ramirez, and the People also agree, and we again concur, that Assembly Bill 333 requires that the gang enhancements associated with counts 1 and 2 be reversed.

We reverse the convictions on counts 1 and 2, and the associated true findings and enhancements on those counts, including the gang enhancements. We vacate the sentences in their entirety and remand the matter for further proceedings and/or resentencing.[2] In all other respects, the judgments are affirmed.

---

[2] In light of our disposition, it is unnecessary to address the issues individually raised by Ramirez in the prior appeal and by Castaneda now.

# I.  BACKGROUND

## A.    *The Crimes*

L.R. and M.G. are cousins and former members of the Red Krewe Norteños, a subset of the Norteños criminal street gang.  L.R. and M.G. were hanging out at L.R.'s house on the evening of March 17, 2016, St. Patrick's Day.  They drank beer for several hours.  During the course of the evening, L.R. checked Facebook and saw photographs posted by another cousin, Rosemarie.  L.R. reached out to Rosemarie through Facebook in hopes of getting together.

Rosemarie had been celebrating St. Patrick's Day with her cousin and roommate, "Rita."  Rosemarie and Rita shared an apartment with Ramirez, who was Rosemarie's boyfriend and a current member of the Red Krewe Norteños.  Rosemarie and Rita spent several hours barhopping before meeting up with Ramirez.  The trio continued barhopping and eventually found themselves at a bar called the Spot, where they would soon be joined by Castaneda and Labrasca.

Castaneda and Labrasca had also been partying that day.  Castaneda, who goes by "Silencio," is a current member of the Red Krewe Norteños.  Labrasca is a member of a Norteños subset known as the Varrio Valley High Norteños.  Castaneda and Labrasca were recent acquaintances, having met only a couple of months earlier.  They started drinking beer in Labrasca's backyard in the late afternoon.  They eventually made their way to the Spot, where Labrasca met Ramirez, Rosemarie, and Rita for the first time.

Castaneda and Labrasca arrived at the Spot at approximately 10:30 p.m.  They left the bar with Ramirez at 10:33 p.m. and returned a short time later.  Defendants came and went twice more before returning to the Spot at 11:17 p.m.

In the meantime, Rosemarie was communicating with L.R. via Facebook.  In one such communication, at 11:11 p.m., Rosemarie informed L.R. that she was at a bar with Ray (Ramirez), Silencio (Castaneda), Manny (Labrasca), and her cousin (Rita).  L.R. pressed for an invitation to get together.  Eventually, a plan was made that they would

3

meet and hang out at the apartment Rosemarie shared with Ramirez and Rita. The group left the Spot and made their way to the apartment.

Rosemarie, Rita, and Ramirez occupied a second story apartment in a gated complex. The gates, which provide vehicular access to the complex, can be opened from inside the apartment by means of a "clicker" (i.e., a remote-control gate opener), allowing guests to park in an adjacent parking lot.

L.R. and M.G. pulled up to the apartment complex at approximately 11:46 p.m. L.R. called Rosemarie to ask her to open the gates. The gates opened, and L.R. and M.G. drove into the complex and parked. They got out of the car and were immediately rushed and stabbed. The assailants left the parking lot, and L.R. managed to get a gravely injured M.G. into the car. L.R. drove M.G. to the hospital, where both men were treated for stab wounds. According to GPS data, Ramirez left the apartment complex in a car at 11:51 p.m.

Deputy Steven Salmeron of the Sacramento County Sheriff's Department was on duty in a marked patrol vehicle in the early morning hours of March 18, 2016. Just after midnight, Salmeron attempted a vehicle stop on a car on Florin Road and 55th Street. The car took off at high speed, and Salmeron gave chase. The pursuit came to an end when the car crashed into a truck.

Salmeron contacted the occupants of the car, Castaneda and Labrasca. Salmeron noticed that both men had blood stains on their shirts. He also noticed a strong smell of alcohol emitting from Castaneda. Castaneda was evaluated for driving under the influence and arrested for felony evasion. Labrasca was sent home. Subsequent DNA testing revealed that the blood on Castaneda's shirt was M.G.'s.

B.    *The Investigation*

Detective John Sample was assigned to investigate. Sample interviewed L.R. and M.G. in the hospital in the days and weeks after the attack. Over the course of two separate interviews, L.R. recounted that he arrived at the apartment complex, called

4

Rosemarie, and waited for the gates to open. L.R. recalled that Ramirez opened the gates, and M.G. drove into the complex and parked. L.R. got out of the car on the passenger side thinking, "I'm gonna have a good time, have a couple drinks and go home, go to work the next day." Without warning, he was attacked by three men with knives. L.R. told Sample that he did not get a good look at the men, but "as far as [he] could see, all three of them were in on it."

Sample also interviewed M.G. M.G. recalled that he had been drinking with L.R. on the day of the attack. L.R. decided that he wanted to see Rosemarie, and a plan was made to meet her at a bar. The plan changed, and M.G. and L.R. found themselves driving to her apartment complex instead. M.G. had a bad feeling about meeting Rosemarie, as he had not seen her or her friends in several years. Nevertheless, he felt he should accompany L.R. rather than allow him to make the trip alone. M.G. acknowledged that he used to associate with members of the Red Krewe Norteños. He also acknowledged that he knew Ramirez and Castaneda. Nevertheless, M.G. maintained that he did not have any problems with Ramirez or Castaneda and did not know Labrasca at all. M.G. insisted that he did not know who stabbed him and did not remember how the attack occurred.

## C. The Charges and Jury Trial

Defendants were arrested and charged by an amended information with two counts of attempted murder. (§§ 187, subd. (a), 664—counts 1 and 2). Castaneda was also charged with one count of felony evasion. (Veh. Code, § 2800.2, subd. (a)—count 3). As to counts 1 and 2, the amended information alleged that the offenses were committed willfully, deliberately, and with premeditation (§ 664, subd. (a)), that defendants personally used deadly weapons (knives) in the commission of the offense (§ 12022, subd. (b)(1)), personally inflicted great bodily injury on L.R. and M.G. (§ 12022.7 subd. (a)), and committed the offenses for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). The amended information additionally alleged that Ramirez had two prior

5

serious felony convictions. Defendants entered not guilty pleas and denied the allegations.

The matter was tried to a jury in September 2017. During the trial, L.R. testified that he remembered going to the apartment complex on the night of the attack but did not remember the attack itself. L.R. acknowledged that he was a former member of Red Krewe Norteños and allowed that dropouts are looked upon with disfavor.

M.G. testified in custody after refusing to comply with a subpoena. M.G. testified that he did not remember anything about the night of the attack and did not remember being stabbed. M.G. acknowledged that he was a reluctant witness.

Sample testified that he arrested Labrasca on March 25, 2016, and noticed two straight cuts on Labrasca's right index finger.

Sample also testified as a gang expert. He described the history of the Norteños in the Sacramento area, focusing on the Red Krewe Norteños and Varrio Valley High Norteños subsets. He testified about two predicate offenses committed by members of the subsets: an assault with a deadly weapon on a dropout by three members of the Red Krew Norteños, and an unlawful possession of a stolen firearm by a felon by a member of the Varrio Valley High Norteños.

Sample opined that Ramirez and Castaneda were active members of the Red Krewe Norteños, and Labrasca was an active member of the Varrio Valley High Norteños. Sample based his opinion on defendants' gang-related tattoos and clothing, their admissions, and photographs of them displaying gang hand signs. Sample also reviewed and relied on police records documenting contacts with defendants in the company of known gang members. Based on a hypothetical with facts similar to the present case, Sample opined that a coordinated attack on former gang members by current members from two subsets would benefit the gang by enhancing its reputation for violence and sending a message about the consequences of dropping out.

6

Labrasca testified on his own behalf. Labrasca acknowledged that he was an active member of the Varrio Valley High Norteños. Labrasca testified that he first met Ramirez on the night of the attack, and he met Castaneda several months earlier. Labrasca stated that he had never heard of L.R. or M.G. prior to the night of the attack.

Labrasca testified that he spent several hours drinking with Castaneda on St. Patrick's Day, beginning with beers in his backyard at approximately 4:00 p.m., and ending with brandy in the car on the way to the Spot. They arrived around 10:30 p.m. After an hour or so, Castaneda asked Labrasca if he wanted to go to Ramirez's apartment to drink some more. Labrasca said yes. Defendants drove to the apartment complex and parked. They stood outside the apartment joking around and laughing at Ramirez, who was "being a fool."

After some time, Ramirez walked away from the group. Approximately one minute later, Labrasca said he heard "a commotion," with "yelling" and "arguing." Labrasca walked towards the sound and saw "two people, like, wrestling on the ground." As he drew closer, Labrasca recognized one of the combatants as Ramirez.

Labrasca testified he was trying to help Ramirez when a second man "came out of nowhere" and "looked like he wanted to fight." According to Labrasca, the second man grabbed him by the lapels and began grappling with him, trying to force him to the ground. Labrasca grappled with the man for approximately one minute. He then heard Castaneda say that it was time to go.

Castaneda pulled Labrasca away from his adversary, and the two jogged to Castaneda's car and drove away. As they drove, Labrasca noticed his hand was bleeding. Moments later, he noticed that Deputy Salmeron's patrol vehicle was behind them.

On cross-examination, Labrasca acknowledged that he repeatedly lied to law enforcement during the course of the investigation. Among other things, Labrasca lied about what he was doing on the night of the attack and how he happened to injure his hand. Labrasca also acknowledged that, as a gang member, he regularly carried knives or

7

box cutters for protection.  However, he denied that he had any such weapon on the night of the attack.  He could not say how he cut his hand.

D.     *Jury Instructions and Closing Argument*

The jury was instructed with three theories of guilt for attempted murder:  direct perpetrator, direct aiding and abetting an attempted murder, and attempted murder as the natural and probable consequence of a battery.  The prosecutor relied on all three theories in closing argument.

E.     *Verdict and Sentence*

The jury found defendants guilty of attempted murder (counts 1 and 2), and Castaneda guilty of felony evasion (count 3).  The jury found true allegations that Ramirez inflicted great bodily injury on L.R., and Castaneda and Labrasca inflicted great bodily injury on M.G.  The jury also found true allegations that the crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).  The jury rejected the other enhancement allegations, including the allegation that defendants personally used deadly weapons (knives) in the commission of the offense (§ 12022, subd. (b)(1)).

Defendants appeared for judgment and sentencing on November 3, 2017.  The trial court sentenced Ramirez to an aggregate indeterminate term of 54 years to life (27 years for each count, composed of the upper term of nine years, tripled), consecutive to an aggregate determinate term of 23 years (three years for the great bodily injury enhancement, and two 10-year gang enhancements, one for each count).  The trial court sentenced Castaneda to an aggregate term of 27 years eight months, and Labrasca to an aggregate term of 23 years eight months.

F.     *Prior Appeal*

As noted, defendants prior appeal raised various claims of instructional error.  We rejected defendants' claims of instructional error and affirmed their convictions in an unpublished opinion issued on December 23, 2019.

8

Ramirez separately raised other claims, mostly relating to his sentence. We rejected Ramirez's claims that the trial court abused its discretion in denying a pretrial motion to bifurcate the gang allegations and a post-trial motion to strike his prior serious felony convictions pursuant to section 1385 and *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497. We agreed with Ramirez that the trial court erred in imposing two 10-year gang enhancements pursuant to section 186.22, subdivision (b)(1)(C). We also found that the record was ambiguous as to whether the trial court recognized its discretion to impose something other than the upper term or a concurrent sentence. We vacated the gang enhancements and remanded for resentencing to allow the trial court to exercise discretion to impose something other than the upper term. In all other respects, we affirmed the judgments.

On March 25, 2020, our Supreme Court granted review pending resolution of *People v. Lopez,* S258175.[3] While the appeal was pending, the Legislature enacted Senate Bill 775 and Assembly Bill 333, both effective January 1, 2022. On February 16, 2022, the Supreme Court transferred the matter back to us with directions to vacate our prior opinion and reconsider the cause in light of Senate Bill 775. We have vacated our prior opinion and considered supplemental briefing from the parties, including regarding the effect of Assembly Bill 333 on defendants' convictions. (See Cal. Rules of Court, rule 8.200(b).)

---

[3] In *Lopez*, the Court was considering (1) whether Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015; Senate Bill 1437) applied to attempted murder; and (2) whether to convict an aider and abettor of attempted willful, deliberate, and premeditated murder under the natural and probable consequences doctrine, a premediated attempt to murder had to have been a natural and probable consequence of the target offense. (See *People v. Favor* (2012) 54 Cal.4th 868.)

## II. DISCUSSION

### A. *Attempted Murder (Counts 1 & 2)*

The parties agree, as do we, that the attempted murder convictions in counts 1 and 2 must be reversed due to postconviction changes in the law brought about by Senate Bill 775.

#### 1. *Senate Bills 1437 and 775*

Senate Bill 1437 limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder. (*People v. Lewis* (2021) 11 Cal.5th 952, 957, 959; *People v. Gentile* (2020) 10 Cal.5th 830, 842-843 (*Gentile*).) To achieve these goals, Senate Bill 1437 added section 189, subdivision (3) (limiting application of the felony-murder rule) and section 188, subdivision (a)(3) (stating that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime"). As amended, section 188 "bars a conviction for first or second degree murder under a natural and probable consequences theory." (*Gentile, supra,* at p. 846.) Senate Bill 1437 also added former section 1170.95, which creates a procedure whereby persons convicted of murder under a now-invalid felony-murder or natural and probable consequences theory may petition for vacation of their convictions and resentencing.[4]

After trial and our previous opinion in this case, Senate Bill 775 changed the law in several respects. Two are relevant here. First, Senate Bill 775 added subdivision (g) to former section 1170.95. That subdivision provides: "A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct

---

[4] Effective June 30, 2022, former section 1170.95 was recodified without substantive change to section 1172.6. (Stats. 2022, ch. 58, § 10.) In this opinion, we shall continue to refer to this section as former section 1170.95.

appeal the validity of that conviction based on the changes made to Sections 188 and a89 by Senate Bill 1437." (See Stats. 2021, ch. 551, § 2.) Subdivision (g) supersedes *Gentile*'s holding that Senate Bill 1437's ameliorative provisions do not apply on direct appeal (see *Gentile, supra,* 10 Cal.5th at p. 839) and allows defendants to challenge the validity of their convictions now. (See *People v. Hola* (2022) 77 Cal.App.5th 362, 369-370; *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 584.)

Second, Senate Bill 775 expanded Senate Bill 1437 to reach attempted murder. As originally enacted, former section 1170.95's express language encompassed only murder, not attempted murder or manslaughter. Accordingly, prior to enactment of Senate Bill 775, California appellate courts concluded that section 1170.95 did not extend to convictions for those offenses. (See *People v. Flores* (2020) 44 Cal.App.5th 985, 993-994.) Senate Bill 775 amended former section 1170.95 to expressly encompass attempted murder and manslaughter. (Former § 1170.95, subd. (a); see also former § 1170.95, subd. (d)(1); *People v. Porter* (2022) 73 Cal.App.5th 644, 651-652; *People v. Coley* (2022) 77 Cal.App.5th 539, 544; see Stats. 2021, ch. 551, § 1 [Senate Bill 775 clarifies "that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural [and] probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories"].) Thus, Senate Bill 775 eliminates the natural and probable consequences doctrine as a basis to prove an accomplice committed attempted murder. (*People v. Sanchez* (2022) 75 Cal.App.5th 191, 196.)

Under *In re Estrada* (1965) 63 Cal.2d 740, 745, we assume that, absent contrary evidence, an amendment reducing punishment for a crime applies retroactively to all nonfinal judgments. (See *People v. Brown* (2012) 54 Cal.4th 314, 323; *People v. Garcia* (2018) 28 Cal.App.5th 961, 973.) Such is the case with Senate Bill 775. (*People v. Montes* (2021) 71 Cal.App.5th 1001, 1006-1007; *People v. Porter, supra,* 73 Cal.App.5th at p. 652.) For retroactivity purposes, a judgment is not final until the time for petitioning

for a writ of certiorari in the United States Supreme Court has passed. (*People v. Vieira* (2005) 35 Cal.4th 264, 306.) Defendants' direct appeals were not final when Senate Bill 775 took effect; therefore, the amendments apply retroactively to them.

  2.  *Analysis*

  It is undisputed that the jury was instructed that defendants could be found guilty of attempted murder under the natural and probable consequences of battery, a theory of liability that is no longer valid following the passage of Senate Bill 775. (§ 188, subd. (a)(3); see also *People v. Sanchez* (2022) 75 Cal.App.5th 191, 196.) While the jury was also instructed with direct aiding and abetting principles, the prosecutor relied on the natural and probable consequences theory of liability, and the trial court instructed jurors they were not required to unanimously agree on any single theory. The instructions given to the jury thus permitted defendants to be convicted of attempted murder based on a now invalid theory.

  Where the jury is instructed on two theories of liability—one valid and one invalid—we must reverse the conviction unless we can conclude beyond a reasonable doubt that the error was harmless. (*People v. Aledamat* (2019) 8 Cal.5th 1, 13 ["The reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt"].) The People appropriately concede that the record here does not show beyond a reasonable doubt that jurors relied on a legally valid theory in finding defendants guilty of attempted murder.

  The prosecutor emphasized the natural and probable consequences theory in closing argument and reminded jurors that they were not required to agree on any particular theory of liability. Jurors asked the trial court during deliberations whether they could find defendants "guilty through aiding and abetting without having identified a specific perpetrator?" The trial court responded that they were not required to identify a specific perpetrator or unanimously agree on a theory of liability. The jury returned

verdicts later that same day. The verdicts do not disclose which theory or theories the jury relied upon; however, they do not allow us to infer that jurors discounted the natural and probable consequences theory. Nor do they foreclose the possibility that jurors may have found each defendant guilty of attempted murder as the natural and probable consequence of battery, without finding that any defendant had the requisite intent for attempted murder. Under the circumstances, we are unable to say beyond a reasonable doubt that jurors could not have relied on the natural and probable consequences theory in finding defendants guilty of attempted murder.

Defendants' convictions for attempted murder (counts 1 & 2) must be reversed, and all findings and enhancements associated with those counts reversed as well. On remand, the prosecution may retry defendants for attempted murder on a legally valid theory. (See, e.g., *People v. Chiu* (2014) 59 Cal.4th 155, 168, superseded by statute as stated in *People v. Lewis, supra*, 11 Cal.5th at p. 959.)

B.      *Gang Enhancements*

Castaneda and Ramirez also argue that Assembly Bill 333 requires reversal of the gang enhancements here. The People concede the issue, and we accept the concession.

1.      *Assembly Bill 333*

Assembly Bill 333 amended section 186.22 by, among other things, changing the definition of "pattern of criminal gang activity," specifying the benefit to the gang must be more than reputational, and eliminating certain crimes as qualifying predicate offenses. (Stats. 2021, ch. 699, §§ 3, 4.) Assembly Bill 333 also added section 1109 which requires that a gang allegation shall be tried separately at the request of a defendant and only after the defendant is found guilty of the substantive offense. (Stats. 2021, ch. 699, § 5.) Castaneda, Ramirez, and the People agree, and so do we, that Assembly Bill 333's ameliorative changes to section 186.22 apply retroactively to defendants, as their judgments were not final when the changes took effect on January 1, 2022. (*People v. Lopez* (2021) 73 Cal.App.5th 327, 343-344.) Castaneda, Ramirez, and

13

the People also agree, as do we, that the changes to section 186.22 call for reversal of the gang enhancements.

As amended, section 186.22, subdivision (f) requires that predicate crimes were committed by two or more gang members acting in concert, rather than by a lone gang member. (See *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1088-1089.) Here, the prosecution presented evidence of two predicate offenses, only one of which was alleged to have been committed by gang members collectively. Further, as the People appropriately acknowledge, there was no evidence that the predicate crimes commonly benefited either gang, or did so in a way that was more than reputational. (See § 186.22, subd. (e)(1); *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822-823; *People v. E.H.* (2022) 75 Cal.App.5th 467, 479; *People v. Sek* (2022) 74 Cal.App.5th 657, 665.) Given these evidentiary deficits, the true findings on the gang enhancements must be reversed, and the matter remanded to allow the prosecution the option of retrying the enhancements and establishing all elements required by Assembly Bill 333. (*People v. E.H., supra,* at p. 480; *People v. Delgado, supra,* at p. 1091.)

### III. DISPOSITION

Defendants' convictions for attempted murder (counts 1 and 2) are reversed. All special findings and enhancements—including gang findings and enhancements—are vacated. The matter is remanded to the trial court for further proceedings. The People shall have 60 days from the date of the remittitur in which to file an election to retry defendants (1) on a legally viable theory of attempted murder, and (2) under the new law as amended by Assembly Bill 333. In all other respects, the judgments are affirmed.

/s/

_____

RENNER, J.

We concur:

/s/

_____

HULL, Acting P. J.

/s/

_____

HOCH, J.